**Electronically Filed
Supreme Court
SCWC-12-0000778
25-NOV-2015
08:54 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

NOEL MADAMBA CONTRACTING LLC,
Petitioner/Movant and Cross-Respondent-Appellant,

vs.

RAMON ROMERO and CASSIE ROMERO,
Respondents/Respondents and Cross-Petitioners-Appellees,

and

A&B GREEN BUILDING LLC,
Respondent/Cross-Respondent-Appellee.

_____

SCWC-12-0000778 & SCWC-12-0000868

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000778 & CAAP-12-0000868; S.P. NO. 12-1-0210)

NOVEMBER 25, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY WILSON, J.

In this case we consider the issue first addressed in

Nordic PCL Constr., Inc. v. LPIHGC, LLC, 136 Hawai'i 29, 358 P.3d

1 (2015), of whether under the Hawai'i Uniform Arbitration Act (HUAA) (codified at Hawai'i Revised Statutes (HRS) chapter 658A), a decision of a neutral arbitrator must be vacated due to evident partiality.

The case arises from the arbitration of a construction contract dispute between homeowners Ramon Romero and Cassie Romero (the Romeros) and contractor Noel Madamba Contracting LLC (Madamba). The main question before us is whether arbitrator Patrick K.S.L. Yim's (Yim) failure to disclose his possible attorney-client relationship with the Romeros' counsel's law firm constituted evident partiality requiring vacatur of the arbitration award by the circuit court.

Following Yim's issuance of a partial final arbitration award, the parties learned that Cades Schutte LLP (Cades)—the law firm representing the Romeros throughout the arbitration—had been retained by the administrator of Yim's personal retirement accounts to ensure that the accounts complied with state and federal laws. Based on this previously undisclosed information, Madamba moved to vacate the arbitration award. The Circuit Court of the First Circuit (circuit court) denied Madamba's motion to vacate, determining that Yim's failure to disclose did not constitute evident partiality. The Intermediate Court of Appeals (ICA) affirmed.

2

We hold that Yim's failure to disclose his relationship with Cades created a reasonable impression of partiality, and as such, resulted in a violation of the disclosure requirements enumerated in HRS § 658A-12. As we recently held in Nordic, for neutral arbitrators, a violation of the disclosure statutes results in evident partiality as a matter of law. 136 Hawai'i at 50, 358 P.3d at 22. Thus, the circuit court's determination that there was no showing of evident partiality was clearly erroneous. We also clarify Nordic and hold that pursuant to the plain language of HRS § 658A-23(a)(2)(A), where there is evident partiality on the part of a neutral arbitrator, the award shall be vacated. Accordingly, we vacate the ICA and the circuit court's judgments and remand to the circuit court with instructions to vacate the arbitration award.

### I. Background

#### A. Arbitration Proceedings

On June 1, 2009, the Romeros and Madamba entered into a contract in which the Romeros agreed to pay $425,000 for Madamba to complete a new construction for a two-story home in Honolulu, Hawai'i. Over a year later, in November 2010, Keith Y. Yamada (Yamada), an attorney from the law firm Cades, sent a

3

demand letter to Madamba and A&B Green Building LLC (A&B)[1] notifying them that Cades had been retained by the Romeros and that legal action would be taken against them for breach of contract as the project had been abandoned.

On February 28, 2011, the Romeros filed a demand for arbitration against Madamba and A&B alleging seven separate counts, including breach of contract.[2] The demand was submitted to Dispute Prevention & Resolution, Inc. (DPR). The Romeros continued to be represented by Yamada of Cades along with Andrew L. Salenger, also of Cades. The parties provided ranked lists of proposed third-party neutrals to DPR and based on the lists received, Yim was appointed as arbitrator on May 31, 2011. On June 1, 2011, Yim provided his disclosures through DPR Case Manager Kelly Bryant (Bryant). The disclosures noted, inter alia, that while Yim was a judge,[3] "counsel and members of their firms appeared before [him]" and that "[s]ince retirement, [he

---

[1] A&B was hired by the Romeros to provide design services in relation to the project. A&B did not participate in the arbitration at issue.

[2] Both the agreement between the Romeros and Madamaba and the agreement between the Romeros and A&B provided for arbitration for disputes. The agreement with Madamaba noted that disputes should first be submitted to the architect in charge of the project prior to submitting them to arbitration. In their demand for arbitration, the Romeros stated that the agreement provided "that disputes may first be submitted to [the architect] for decision before being referred to arbitration," but noted that "in light of the number and pervasiveness of the disputes herein," referring the matter to the architect would not "assist in reaching a resolution."

[3] Yim is a former judge of the Circuit Court of the First Circuit.

4

had] served as a [n]eutral for counsel and members of their firms." Yim made no disclosures regarding his relationship with Cades in connection with his personal retirement accounts.

The arbitration hearings took place on November 2-4, 2011. On January 26, 2012, Yim issued his Partial Final Award of Arbitrator (Partial Final Award). Yim concluded that Madamba breached the construction contract and that the Romeros were entitled to recover $154,476.51 in compensatory damages. Yim retained jurisdiction to address attorneys' fees and costs.

In February and March 2012, following the issuance of the Partial Final Award, Yim made three supplemental disclosures to the parties regarding his relationship with Cades in connection with his personal retirement accounts. All three supplemental disclosures were transmitted to party counsel by Bryant via email.

Bryant sent the first supplemental disclosure to party counsel on February 22, 2012, almost a month after Yim issued his Partial Final Award. The disclosure informed the parties that Cades had been recently retained by the administrator of Yim's personal retirement accounts to handle compliance documentation related to his accounts. The disclosure stated that Yim hired Pension Services Corporation (PSC) in the 1990s to manage his personal retirement accounts and PSC's role

5

included ensuring that Yim's accounts were "compliant with all state and federal laws." PSC hired Cades to assist in the legal review of Yim's accounts and according to the disclosure, Yim's role in Cades's retention was limited:

> Recently, PSC retained two law firms in Honolulu to handle their clients' compliance documentation. Judge Yim's account was in the group given to Cades Schutte.
>
> Please note that Judge Yim is PSC's client, Judge Yim did not select or retain Cades Schutte personally, and he had no input as to who PSC selected. The Judge was advised that his accounts were given to Cades after the fact. Judge Yim will sign documents drafted by Cades, and Cades will invoice Judge Yim directly for any compliance work done on his account.

Bryant's email also noted that Yim "[did] not feel this disclosure will in any way affect his ability to serve in a neutral and unbiased manner, but felt it was best to disclose this newly discovered information." DPR requested that any comments regarding the disclosure be filed in writing by February 24, 2012.

On February 24, 2012, Madamba objected to Yim serving as arbitrator based on the supplemental disclosure, and requested more information regarding Yim's relationship with Cades. The Romeros also responded to the disclosure. Specifically, the Romeros' counsel, Yamada, stated that he confirmed with the firm's pension benefits counsel, Ellen Kawashima (Kawashima), that Cades had done "no work for PSC on Judge Yim's account and will not do so if at all until the

6

completion of the Romero arbitration." Yamada further noted that "[t]here is no existing relationship that is in place and no engagement letter signed." Yamada also stated that he personally had no knowledge of the "proposed relationship" prior to Yim's disclosure and stated that "[a]ll rulings prior to February 24th must remain undisturbed because no one (neither Judge Yim nor Cades Schutte) could have foreseen during the Madamba arbitration that this relationship might develop."

On February 29, 2012, Bryant provided a second supplemental disclosure regarding Yim's relationship with Cades. Bryant stated that Yim first spoke with Kawashima "a day or a couple days before this most recent disclosure was sent out"[4] and that "[h]e instructed [Kawashima] to run a conflict check through her firm." Bryant also stated that Cades had not provided Yim with any services nor had Yim signed an engagement letter with Cades or paid any fees to Cades. Finally, the disclosure noted that Yim had instructed PSC to withdraw his file from Cades and send the work to another law firm. DPR requested any comments before March 2, 2012. In response, Madamba's counsel requested additional information and clarification regarding the disclosures.

---

[4] In the third supplemental disclosure it was clarified that "this most recent disclosure" referred to the February 22, 2012 first supplemental disclosure.

The third and final supplemental disclosure, emailed to party counsel on March 5, 2012, provided additional details about Yim's relationship with Cades.  The disclosure stated that "Yim advised DPR that Nobuo Kiwada [(Kiwada)] handles his account at [PSC]" and that Kiwada could provide an "accurate timeline" of the relevant events.  According to the disclosure, Kiwada first raised the possibility of Cades's review of Yim's retirement accounts with Yim in May 2011—the month Yim was confirmed by the parties as a neutral arbitrator—and Yim deferred to Kiwada as to which firm would be involved:

> In May 2011, Mr. Kiwada advised Judge Yim that certain amendments would need to be done to all pension documents to comply with all new state and federal laws.  Mr. Kiwada was considering various attorneys of which Roger Fonseca [of Cades] was one.  Judge Yim advised Mr. Kiwada that he would defer to Mr. Kiwada's judgment as to who to send his file to, and Judge Yim was not involved in PSC's decision as to which law firms would be selected.

According to the disclosure, "[n]othing further was done on this issue until December 30, 2011 when PSC sent a letter to all their clients advising them that their files would be sent to a law firm (no law firm was named in the letter) to handle [certain statutory] requirements."

The disclosure further noted that Cades's involvement became more definite several months later when Kiwada informed Yim that his accounts would likely be reviewed by Cades: "On

January 30, 2011,[5] Mr. Kiwada advised Judge Yim that his file would be sent to a law firm, probably Cades." At this point, Yim again "advised Mr. Kiwada that he would leave it up to Mr. Kiwada to determine which law firm would receive his file." Regarding Yim's contact with Cades in relation to his retirement accounts, the disclosure stated: "Judge Yim first spoke with Ellen Kawashima at the Cades firm one or two days days [sic] prior to his <u>February 22, 2012</u> disclosure. Until his conversation with Ellen, he did not know his file was with Cades." Finally, the disclosure stated that Bryant confirmed with Kiwada that Yim's file had "been reassigned to another law firm."

Madamba responded to the third disclosure, requesting additional information related to the communications between Yim and Kiwada that occurred in May 2011. Madamba also argued that the Partial Final Award should be vacated due to Yim's violations of the disclosure rules. Despite Madamba's objections and its request for additional discovery, DPR affirmed Yim's role as arbitrator and informed the parties that Yim would issue a final arbitration award.[6]

---

[5] Kiwada later testified that the meeting at issue took place on January 20, 2012 and not in 2011.

[6] Madamba's counsel notified DPR that Madamba had filed a Motion to Vacate the Partial Final Award along with a Motion to Stay Arbitration

(continued . . .)

9

On April 25, 2012, Yim issued the Final Award of Arbitration (Final Award), which incorporated the Partial Final Award and awarded the Romeros approximately $42,000 in attorneys' fees, based on work performed by Cades.

## B.  Circuit Court Proceedings

Following Yim's supplemental disclosures, Madamba filed pleadings in the circuit court to disqualify Yim, stay the arbitration proceeding, and vacate the Partial Final Award. However, prior to the circuit court's hearing on Madamba's motion to vacate the Partial Final Award, Yim issued the Final Award.

Accordingly, after Yim issued the Final Award, Madamba filed a Motion to Vacate Final Award, arguing, inter alia, that Yim failed to disclose his relationship with Cades and that "there was evident partiality of the [a]rbitrator."  In support, Madamba cited several provisions of HRS chapter 658A[7] as well as DPR Rule 9, which required that arbitrators disclose "any past, present, or possible future relationship with the parties, their

( . . . continued)
Proceedings and Disqualify Yim in the circuit court and that the arbitration should be stayed pending the resolution of the motions.  DPR responded that since there was no court order to stay arbitration and no mutual agreement between the parties, Yim would proceed to issue a final award.

[7]    Pursuant to HRS § 658A-3(c) (Supp. 2001), "[a]fter June 30, 2004, [chapter 658A] governs an agreement to arbitrate whenever made."

10

witnesses, their counsel or another arbitrator including any bias or any financial or personal interest in the result of the arbitration."  The Romeros filed a Motion to Confirm Final Award.

Madamba also requested additional discovery related to Yim's relationship with Cades.  Specifically, Madamba subpoenaed and, as a result, received records from DPR.[8]  Madamba also deposed three PSC employees:  Kiwada, the president of PSC; Julie Kiwada (Julie), Kiwada's daughter who was being trained as a consultant at PSC; and Bruce Lee (Lee), a pension consultant. Madamba also deposed Kawashima, the Cades pension benefits attorney who had been mentioned in the disclosures.[9]

Kiwada's deposition testimony confirmed that Kiwada met with Yim in May 2011—more than seven months before Yim issued the January 26, 2012 Partial Final Award—and advised Yim that PSC would be negotiating with Cades and the law firm Carlsmith Ball LLP (Carlsmith) to potentially handle compliance work related to his retirement accounts.  Kiwada also testified

---

[8]     Madamba filed a motion to compel production of the DPR files, and DPR objected on the grounds that HRS § 658A-14(d) "preclude[d] the production of documents by DPR or any arbitration association unless you can show basically a prima facie ground to vacate the award."  The circuit court disagreed with DPR, stating that a prima facie showing had been made and ordered DPR to produce certain records from the arbitration.

[9]     Kawashima's deposition transcript was not included in the record on appeal and, thus, was not considered by this court.

that he informed Yim he would eventually recommend one of the two firms to represent him.  The DPR documents revealed that the next month, in June 2011, PSC sent an email to Kawashima at Cades providing the names of several clients, including Yim, so that Cades could research potential conflicts of interest.  Kawashima responded to PSC, stating that that there was no conflict between Cades and Yim.

Approximately six months later, in December 2011, PSC sent a letter to Yim stating that it "had made arrangements with two [Employee Retirement Income Security Act (ERISA)] law firms in Honolulu" to complete work related to his pension plan.  Specifically, the law firms would be ensuring that Yim's plans complied with the requirements of the Economic Growth & Tax Relief Reconciliation Act prior to submission to the Internal Revenue Service.  The letter noted that the fee charged by the law firm would be "approximately $2,500."

Both Kiwada and Julie also testified that they met with Yim in January 2012 regarding his retirement plan.  Kiwada and Julie stated that this meeting occurred on January 20, 2012.  The meeting date was corroborated by handwritten notes taken by Julie.  Their testimony that the meeting date was January 20th—six days before Yim issued the Partial Final Award—did not match the date in Yim's third supplemental disclosure, which stated

12

that Yim and Kiwada met on January 30th.  Yim's disclosure stated that, "Kiwada advised Judge Yim that his file would be sent to a law firm, probably Cades."  However, Kiwada did not remember whether he had specifically mentioned Cades during the meeting, and Julie testified that she thought "[they] did talk about it" but could not "recall the details."

Four days following the meeting, on January 24, 2012—and two days before issuance of the January 26, 2012 Partial Final Award—Julie emailed documents related to Yim's retirement plan to Kawashima at Cades.  The transmittal email noted: "We spoke to the client and he knows the fee and that your engagement letter should be coming soon."

Following transmission of the files to Cades, it appears that Yim, PSC, and Kawashima discussed the issue of a potential conflict between Cades and Yim.  A February 15, 2012 internal PSC email from Kiwada to Julie, Lee, and others states: "Pat Yim will resolve his situation directly with Cades.  Ellen [Kawashima] will get back to us in a couple of days if Cades can still represent Pat Yim."  On February 21, 2012, Yim sent an email to Bryant at DPR explaining the situation with PSC and Cades and stating that Kiwada "made the decision to refer [his] compliance work with a group of his clients to the Cades firm."  Yim stated that he would be billed directly by Cades for the

13

"work performed" but that other than providing signatures as necessary he did "not expect[] to interact with the firm."  The first supplemental disclosure was sent to the parties the following day.  Thus, when Yim sent this supplemental disclosure on February 22, 2012, he was aware Cades would be acting as his personal attorney.

On June 12, 2012, Madamba filed a motion to continue the hearing on the Motion to Vacate Final Award and Motion to Confirm Final Award which had been set for June 19, 2012.  Madamba stated that it needed additional time to conduct discovery on the disclosure issue, including taking the depositions of Yim and Bryant.[10]  The circuit court granted Madamba a continuance to introduce evidence in support of its Motion to Vacate Final Award.

On June 18, 2012, Madamba noticed Yim's deposition as well as the depositions of Bryant and DPR's Chief Executive Officer, Keith Hunter (Hunter).  DPR's counsel filed a motion for a protective order, stating that Yim and the DPR employees were immune from testifying pursuant to HRS § 658A-14(d)(2).[11]

---

[10]     In the motion, Madamba also argued that it had the right to a jury trial on the disclosure issue.  The circuit court denied Madamba's request for a jury trial but discussed Madamba's right to an evidentiary hearing.  The court determined, however, that because Madamba had failed to make a prima facie showing of evident partiality, an evidentiary hearing was not warranted.  This issue was not raised on certiorari.

[11]     HRS § 658A-14(d)(2) (Supp. 2001) provides:

(continued . . .)

14

The motion for protective order was set for hearing on August 1, 2012, the same date the circuit court had scheduled to hear the Romeros' Motion to Confirm and Madamba's Motion to Vacate. Madamba filed an ex parte motion to shorten time on the motion for protective order, claiming there were numerous disputed issues of facts which required further discovery from Bryant, Hunter, and Yim. The motion to shorten time was denied by the circuit court on July 2, 2012.

Madamba then filed a memorandum in support of its motion to vacate, arguing, inter alia, that Yim breached his duty to disclose under the DPR rules and HRS § 658A-12(a), which requires an arbitrator to disclose "any known facts that a

_____

( . . . continued)

**Immunity of arbitrator; competency to testify; attorney's fees and costs.**

. . . .

(d) In a judicial, administrative, or similar proceeding, an arbitrator or representative of an arbitration organization is not competent to testify, and shall not be required to produce records as to any statement, conduct, decision, or ruling occurring during the arbitration proceeding, to the same extent as a judge of a court of this State acting in a judicial capacity. This subsection does not apply:

. . . .

(2) To a hearing on a motion to vacate an award under section 658A-23(a)(1) or (2) if the movant establishes prima facie that a ground for vacating the award exists.

reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding." On this basis, Madamba maintained that Yim's failure to disclose resulted in evident partiality and that accordingly, the arbitration award should be vacated. The Romeros filed a response to Madamba's motion, arguing that Madamba failed to meets its burden in demonstrating evident partiality.

The circuit court heard the Motion to Vacate Final Award, Motion to Confirm Final Award, and DPR's motion for a protective order on August 1, 2012.[12] After hearing from the parties, the circuit court orally denied Madamba's Motion to Vacate and granted the Romeros' Motion to Confirm Final Award, explaining its reasoning on the record. The court determined that the relationship between Yim and Cades was a "possible future relationship" and thus DPR Rule 9 had been violated. However, the court indicated that there was no violation of HRS § 658A-12 citing to the language in HRS § 658A-12(a)(2), which specifically refers to disclosures of "existing or past relationship[s]." In this respect, the court stated:

> What we have here, we have a particular situation which, under the DPR, Rule 9 speaks to a possible future relationship and a disclosure. There is no dispute that under 658A-12, it speaks to existing or past relationship. Now, both parties had agreed to be bound by the DPR rules regarding whatever rules DPR sets forth which includes disclosure of a possible -- possible -- future

---

[12] The Honorable Rhonda A. Nishimura presided.

16

> relationship. What we have here is the existence of a possible future relationship.

The court next considered whether there was evident partiality pursuant to HRS § 658A-23. First, the court reiterated that the relationship between Cades and Yim "was a potential" or "possible" future relationship that was never "formulated," whereas relevant caselaw finding evident partiality for a failure to disclose considered "prior" or "current" relationships. The court additionally addressed Madamba's claim that "particular instances" in the record demonstrated evident partiality. In this regard, the court determined Madamba failed to demonstrate evident partiality. Accordingly, the court denied Madamba's motion to vacate and granted the Romeros' motion to confirm.

The circuit court additionally determined that DPR's motion for protective order was moot, given its confirmation of the Final Award.

## C. ICA Appeal

Madamba raised several issues before the ICA. Of relevance on certiorari, Madamba argued that the circuit court's finding that Yim failed to disclose his relationship with Cades in violation of DRP Rule 9—in and of itself—required the circuit court to vacate the award. Further, Madamba contended that Yim violated his duty to disclose under HRS § 658A-12(a),

17

which he claimed encompasses a requirement to disclose potential future relationships that "a reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding." (Quoting HRS § 658A-12(a)).  Madamba additionally argued that the circuit court erred in refusing to allow additional discovery, including the depositions of Bryant, Hunter, and Yim.

In response, the Romeros argued that the circuit court properly denied Madamba's motion to vacate because Madamba failed to demonstrate evident partiality.  In this regard, the Romeros claimed that a nondisclosure does not alone constitute evident partiality and that the potential relationship between Cades and Yim, which was never consummated, did not create the impression of bias warranting vacatur.  Regarding the depositions of Bryant, Hunter, and Yim, the Romeros argued that the reason the depositions were never taken was that Madamba delayed in scheduling them.  The Romeros further contended that there were no additional facts to be gained through these depositions.

In its Summary Disposition Order, the ICA rejected Madamba's argument that Yim's failure to disclose required the circuit court to vacate the arbitration award.  Noel Madamba Contracting LLC v. Romero, No. CAAP-12-0000778, 2014 WL 2180001,

18

at *3 (App. May 23, 2014) (SDO).  The ICA concluded that although Yim violated the DPR rules because he failed to disclose a possible future relationship with Cades, he was "not necessarily in violation of HRS § 658A-12(a)(2)," which only applies to disclosure of "past or present relationships."  Id. Turning to the question of whether the failure to disclose resulted in evident partiality, the ICA determined that it did not because the relationship between Yim and Cades "remained inchoate during the pendency of arbitration"; "was anticipated to be minimal at best"; and "lacked the significance, actuality, and contemporaneous nature" discussed in the relevant case law. Id. at *3-4.

The ICA also found no error in the circuit court's decision to rule on Madamba's motion to vacate prior to the depositions of Yim and the other DPR personnel.  Id. at *4.  In this regard, the ICA held that a prima facie case for vacating the award did not exist, and thus, the depositions were barred pursuant to HRS § 658A-14(d)(2), which provides immunity for arbitrators and representatives of arbitration organizations. Id.

## II.  Standards of Review

### A.  Findings of Fact and Conclusions of Law

19

A trial court's findings of fact are reviewed under the clearly erroneous standard and conclusions of law are reviewed de novo under the right/wrong standard. Nordic, 136 Hawai'i at 41, 358 P.3d at 13. "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed" or "when the record lacks substantial evidence to support the finding." Id. (quoting Daiichi Hawai'i Real Estate Corp. v. Lichter, 103 Hawai'i 325, 337, 82 P.3d 411, 423 (2003)). Substantial evidence is defined as "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (quoting Daiichi, 103 Hawai'i at 337, 82 P.3d at 423). A conclusion of law that presents a mixed question of law and fact is reviewed under the clearly erroneous standard. Estate of Klink ex rel. Klink v. State, 113 Hawai'i 332, 351, 152 P.3d 504, 523 (2007).

B.    Motion to Vacate Based on Evident Partiality

As stated in Nordic, "in reviewing a circuit court's rulings on a motion to vacate for evident partiality . . . whether a duty of disclosure exists . . . is a question of law; [and] whether it has been breached . . . is a question of

20

fact[.]"  136 Hawai'i at 42, 358 P.3d at 14.  Here, the circuit

court concluded that based on the facts surrounding Yim's

failure to disclose, there was no demonstration of evident

partiality.  Because this conclusion presents a mixed question

of law and fact, we review it under the clearly erroneous

standard.  See, e.g., Panado v. Bd. of Trs., Emps.' Ret. Sys.,

134 Hawai'i 1, 12, 12 n.11, 332 P.3d 144, 155, 155 n.11 (2014)

(stating a "mixed question of law and fact, . . . is simply an

issue that must be determined by applying the law to the facts

of a case" and applying the clearly erroneous standard (citing

Price v. Zoning Bd. of Appeals, 77 Hawai'i 168, 172, 883 P.2d

629, 633 (1994) (applying the clearly erroneous standard of

review to a mixed question of law and fact, defined as a

conclusion "dependent upon the facts and circumstances of the

particular case"))).

C.   **Statutory Interpretation**

"Statutory interpretation is a question of law

reviewable de novo."  State v. Wheeler, 121 Hawai'i 383, 390, 219

P.3d 1170, 1177 (2009) (internal quotation marks omitted).

### III. Discussion

A.   **Evident Partiality and Failure To Disclose**

   1)   **The Circuit Court Clearly Erred in Determining
        that Yim's Failure To Disclose Did Not Result in
        Evident Partiality**

21

In Nordic, we laid out the legal framework relevant to an arbitrator's failure to disclose under HRS chapter 658A. Specifically, as acknowledged in Nordic, 136 Hawai'i at 44-45, 358 P.3d at 16-17, pursuant to the disclosure requirements enumerated in HRS § 658A-12, prior to accepting appointment and "after making a reasonable inquiry," arbitrators are required to "disclose to all parties . . . any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator[.]" HRS § 658A-12(a). Arbitrators also have a "continuing obligation to disclose . . . any facts . . . learn[ed] after accepting appointment which a reasonable person would consider likely to affect the impartiality of the arbitrator." HRS § 658A-12(b).[13] If an arbitrator discloses

---

[13] In full, HRS § 658A-12(a)-(b) (Supp. 2001) states:

> (a) Before accepting appointment, an individual who is requested to serve as an arbitrator, after making a reasonable inquiry, shall disclose to all parties to the agreement to arbitrate and arbitration proceeding and to any other arbitrators any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding, including:
>
> (1) A financial or personal interest in the outcome of the arbitration proceeding; and
>
> (2) An existing or past relationship with any of the parties to the agreement to arbitrate or the arbitration proceeding, their counsel or representatives, a witness, or another arbitrator.
>
> (b) An arbitrator has a continuing obligation

(continued . . .)

facts that a reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding pursuant to HRS § 658A-12(a) or (b) "and a party timely objects to the appointment or continued service of the arbitrator based upon the fact disclosed, the objection may be a ground under section 658A-23(a)(2) for vacating" the award. HRS § 658A-12(c) (Supp. 2001). Similarly, if an arbitrator does not disclose a fact required to be disclosed under HRS § 658A-12(a) or (b), "upon timely objection by a party, the court under section 658A-23(a)(2) may vacate an award." HRS § 658A-12(d) (Supp. 2001). In turn, HRS § 658A-23(a)(2) provides that the court "shall vacate an award made in the arbitration proceeding" upon a motion by a party to the proceeding if, <u>inter alia</u>, there was "[e]vident partiality by an arbitrator appointed as a neutral arbitrator."[14]

---

( . . . continued)
> to disclose to all parties to the agreement to arbitrate and arbitration proceeding and to any other arbitrators any facts that the arbitrator learns after accepting appointment which a reasonable person would consider likely to affect the impartiality of the arbitrator.

[14] In full, HRS § 658A-23(a)(2) (Supp. 2001) provides:

> **Vacating award.** (a) Upon motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if:

(continued . . .)

Our court first established an evident partiality standard for cases involving an arbitrator's failure to disclose in Daiichi Hawai'i Real Estate Corp. v. Lichter, where we acknowledged that "[w]hat constitutes 'evident partiality' sufficient to vacate an arbitration award is a difficult question."  103 Hawai'i at 339, 82 P.3d at 425 (quoting Valrose Maui, Inc. v. Maclyn Morris, Inc., 105 F. Supp. 2d 1118, 1124 (D. Haw. 2000)).  In Daiichi, we considered the circuit court's granting of a motion to vacate an arbitration award pursuant to HRS § 658-9(2), which has since been repealed.  Id. at 327-28, 82 P.3d at 413-14.  Under HRS § 658-9(2) (1993), a court could vacate an arbitration award "upon the application of any party to the arbitration . . . [w]here there was evident partiality . . . in the arbitrators."  We held that evident partiality is "present when undisclosed facts show 'a reasonable impression of partiality.'"  Daiichi, 103 Hawai'i at 339, 82 P.3d at 425

( . . . continued)

                    . . . .

        (2) There was:

            (A) Evident partiality by an arbitrator
            appointed as a neutral arbitrator;
            (B) Corruption by an arbitrator; or
            (C) Misconduct by an arbitrator prejudicing the
            rights of a party to the arbitration
            proceeding[.]

(emphasis added) (quoting Schmitz v. Zilveti, 20 F.3d 1043, 1046 (9th Cir. 1994)). Under this analysis, a finding of evident partiality related to a failure to disclose is not dependent on a showing that the arbitrator was actually biased, but instead stems from the nondisclosure itself. Id. at 352, 82 P.3d at 438 (citing Schmitz, 20 F.3d at 1045). We further noted that the United States Supreme Court had "emphasized the manifest importance of a neutral arbitrator disclosing 'to the parties any dealings that might create an impression of possible bias,'" id. at 341, 82 P.3d at 427 (quoting Commonwealth Coatings Corp. v. Cont'l Cas. Co., 393 U.S. 145, 149 (1968)), but also acknowledged that "not all dealings rise to the level of creating the impression—or reality—of possible bias so as to warrant" vacatur, id. Finally, we stated that "[t]he burden of proving facts which would establish a reasonable impression of partiality rests squarely on the party challenging the award." Id. at 339, 82 P.3d at 425 (citation omitted) (internal quotation marks omitted).

As noted supra, we recently reiterated in Nordic, that evident partiality is established where "undisclosed facts demonstrate a reasonable impression of partiality." 136 Hawai'i at 51, 358 P.3d at 23 (quoting Daiichi, 103 Hawai'i at 340, 82 P.3d at 426) (internal quotation mark omitted). We also, for

the first time, explained the relationship between the standards for disclosure established in HRS § 658A-12 and a finding of evident partiality. In this respect, we determined that in the context of neutral arbitrators, "a failure to meet disclosure requirements under HRS § 658A-12(a) or (b) is equivalent to, or constitutes, 'evident partiality' as a matter of law." Id. at 50, 358 P.3d at 22. Thus, in Nordic, we interpreted the standard required for disclosure under § 658A-12(a) and (b), i.e, "facts a reasonable person would find likely to affect an arbitrator's impartiality," as equivalent to the Daiichi evident partiality standard previously adopted by our court, i.e., undisclosed facts demonstrating a reasonable impression of impartiality.[15]

---

[15] Our standard for evident partiality as well as that of the Ninth Circuit (and some other federal and state courts), requires only a "reasonable impression of partiality," and as such, is more expansive than the standard proposed by a majority of federal circuit courts of appeal, which limit findings of evident partiality to situations "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308, 325 (6th Cir. 1998) (citation omitted) (internal quotation marks omitted); see also Freeman v. Pittsburgh Glass Works, LLC, 709 F.3d 240, 253 (3d Cir. 2013) ("An arbitrator is evidently partial only if a reasonable person would have to conclude that she was partial to one side."); Ometto v. ASA Bioenergy Holding A.G., 12 CIV 1328 (JSR), 2013 WL 174259, at *4 (S.D.N.Y. Jan. 9, 2013) ("The requirement that this Court must perceive partiality so clearly that it 'would have to conclude' the arbitrator was biased before vacating the awards differs from the standard elaborated by the Ninth Circuit, which looks only for 'an impression of possible bias.'"), aff'd, 549 F. App'x 41 (2d Cir. 2014), cert. denied, 134 S. Ct. 2877 (2014).

(continued . . .)

Under this framework, we now consider whether Yim's failure to disclose his relationship with Cades resulted in a violation of HRS § 658A-12(a) or (b), or stated otherwise, whether the failure to disclose resulted in evident partiality, defined in our jurisdiction as a reasonable impression of partiality. In considering this question, we recognize that judicial review of arbitration awards is limited. Daiichi, 103 Hawaiʻi at 339, 82 P.3d at 422. However, because review of an arbitration award is limited, an arbitrator's impartiality and appearance of impartiality is paramount. As a corollary, the

---

( . . . continued)

     Indeed, in the federal courts, there is an "absence of a consensus on the meaning of 'evident partiality.'" Montez v. Prudential Sec., Inc., 260 F.3d 980, 983 (8th Cir. 2001). The confusion stems from the United States Supreme Court's decision in Commonwealth Coatings. In Commonwealth Coatings, Justice Black, writing for at least four justices of the Court, held that an arbitrator's failure to "disclose to the parties any dealings that might create an impression of possible bias" was sufficient to support vacatur. 393 U.S. at 147-49. Accordingly, the court vacated an award where a neutral arbitrator of a three-arbitrator panel failed to disclose his ongoing business relationship with one of the parties. Id. at 146-47.

     Justice White joined the majority opinion but concurred separately, adopting a narrower view of the standard. Justice White noted that arbitrators should not be held to the same standards as judges, id. at 150 (White, J., concurring), but found that "for present purposes" it was sufficient to "hold . . . that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed," id. at 151-52 (White, J., concurring). Justice White's concurrence has opened the door for many of the federal circuit courts of appeal—and some state courts—to adopt a more stringent definition of evident partiality, requiring a showing beyond "an impression of possible bias." Our court's approach follows Justice Black's reasoning.

27

disclosure process is of utmost import.  The Daiichi court recognized as much, quoting the United States Supreme Court for the proposition that "we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review."  Id. at 341, 82 P.3d at 427 (quoting Commonwealth Coatings, 393 U.S. at 149); see also Kay v. Kaiser Found. Health Plan, Inc., 119 Hawai'i 219, 229, 194 P.3d 1181, 1191 (App. 2008) (acknowledging that the "judiciary should play a minimal rule in reviewing impartiality" but noting that "the sine qua non for minimal review must be the arbitrator's fidelity to the disclosure obligation").  Based on these principles, we hold that Yim's failure to disclose his relationship with Cades created a reasonable impression of partiality, and accordingly, the circuit court's findings that there was no violation of Yim's duty to disclose under HRS chapter 658A and no showing of evident partiality are clearly erroneous.[16]

---

[16]    In Nordic, we remanded the case for an evidentiary hearing because "the circuit court did not explain the basis of its rulings on the record or enter findings of fact or conclusions of law" and material facts were in dispute.  136 Hawai'i at 31, 358 P.3d at 3.  Here, however, the material facts were undisputed and the circuit court explained its reasoning for determining there was no evident partiality, as discussed supra and infra.  Accordingly, we are able to review the circuit court's findings.

The key facts in this case establish that Yim was in discussions concerning his representation by Cades during the arbitration proceedings. In summary, in May 2011, Yim met with the administrator of his retirement plan, who informed him that either Cades or Carlsmith would eventually handle compliance work related to his personal retirement accounts. Yim was appointed as arbitrator in the underlying contract dispute the same month, and in June 2011 made a disclosure to the parties regarding his relationship with both law firms, but did not disclose that Cades might be representing him in connection with his personal retirement accounts. Approximately six months later, in December 2011, Yim received a letter from his retirement plan administrator, explaining that arrangements had been made with two local ERISA law firms to review documents related to his retirement accounts, for a fee of "approximately $2,500."

In January 2012, after the arbitration hearing, but while the arbitration was pending, PSC, the administrator of Yim's retirement accounts, met with Yim and informed him that his files would probably be sent over to Cades. Also at this time, PSC transmitted Yim's files to Cades. A few days after the files were transmitted, Yim issued his Partial Final Award on January 26, 2012. Yim made no disclosure regarding his

involvement with Cades until almost a month after issuing the Partial Final Award, when Yim learned that his file had been sent to Cades. It was only when Madamba raised concerns regarding Cades's representation of Yim, that Yim's account was assigned to another law firm. Yim continued to serve as the arbitrator and issued the Final Award over Madamba's objections.

Based on these facts, the circuit court determined that Yim's failure to disclose his relationship with Cades resulted in a violation of DPR Rule 9 insofar as the rule requires the disclosure of certain possible future relationships. Despite having found a violation of the DPR rule, and based, in part, on its description of the relationship between Yim and Cades as yet-to-be "formulated," "potential," "possible," and "future," the circuit court determined there was no evident partiality.[17] In reaching this conclusion, the court stated, "[t]here is no dispute that under 658A-12[(a)(2)], it speaks to existing or past relationship[s]" as opposed to potential and future relationships.

_____

[17] As discussed <u>supra</u>, the circuit court also appeared to consider evidence in the record of Yim's actions during the arbitration that Madamba claimed demonstrated Yim was partial to the Romeros. Such a consideration might be appropriate to the extent Madamba raised an actual bias claim. However, we note that for claims of evident partiality based on a failure to disclose "an arbitrator's nondisclosure of facts showing a potential conflict of interest <u>creates evident partiality warranting vacatur even when no actual bias is present</u>." <u>Daiichi</u>, 103 Hawai'i at 352, 82 P.3d at 438 (quoting <u>Schimitz</u>, 20 F.3d at 1045) (internal quotation marks omitted).

The ICA similarly determined that Yim violated the DPR rules, but stated that he did "not necessarily [violate] HRS § 658A-12(a)(2), as the latter expressly limits disclosure obligations to past or present relationships." Madamaba, SDO, 2014 WL 2180001, at *3. The ICA affirmed the circuit court on the basis that Yim's failure to disclose did not amount to evident partiality because 1) his relationship with Cades was prospective in nature, and 2) the anticipated relationship would have been minimal and indirect. Id. at *3-4.

At the outset, we address the circuit court and the ICA's conclusion in relation to the disclosure requirements in HRS § 658A-12. In this respect, both the circuit court and the ICA specifically referred to HRS § 658A-12(a)(2), which provides an example of information that must be disclosed under HRS § 658A-12(a), namely, "[a]n existing or past relationship with any of the parties . . . , their counsel or representatives, a witness, or another arbitrator." However, notwithstanding whether the nondisclosure at issue here falls under the definition of HRS § 658A-12(a)(2), the nondisclosure may still result in a violation of the more general disclosure requirement in both HRS § 658A-12(a) and (b) of facts that "a reasonable

31

person would consider likely to affect the impartiality of the arbitrator."[18]

Thus, even if the relationship at issue is a prospective or future relationship, a failure to disclose may result in a reasonable impression of partiality, and accordingly, a violation of HRS § 658A-12(a) or (b).  Here, the fact that the relationship between Cades was—to a certain extent—prospective in nature is not determinative, particularly given the broad view of the reasonable impression of partiality standard employed in the relevant case law.  For example, in Valrose, the United States District Court for the District of Hawai'i vacated an arbitration award in a construction dispute where the arbitrator and one of the party's counsel had an ex parte discussion regarding the possibility of the arbitrator serving as the mediator in an unrelated malpractice case.  105 F. Supp. 2d at 1120, 1125.  The discussion occurred during the pendency of the arbitration proceedings, and the arbitrator was appointed to mediate the malpractice case while the arbitration

---

[18]    In Nordic, although we determined that "counsel" under HRS § 658A-12(a)(2) "does not include all attorneys in the law firm of an attorney representing a party to an arbitration," we noted that HRS § 658A-12(a) "requires that an arbitrator disclose facts that a reasonable person would consider likely to affect the arbitrator's impartiality."  136 Hawai'i at 47-48, 358 P.3d at 19-20.  "Depending on the circumstances, such facts could include an arbitrator's relationships with other attorneys within a law firm of counsel representing a party to the arbitration."  Id. at 48, 358 P.3d at 20.

was pending, but the arbitrator failed to disclose the discussion.  Id.  The only evidence in the record of work on the malpractice case that occurred during the pendency of the construction arbitration, however, was one conversation between the arbitrator and the attorneys in the malpractice case.  Id. at 1123.  The court acknowledged that there was no evidence that party counsel acted with "improper motive" or was attempting to bias the arbitrator, but nonetheless concluded that "the nondisclosure of the discussion and appointment . . . was clearly a serious failing" resulting in a reasonable impression of partiality and requiring vacatur.  Id. at 1123-24.

Similarly, in New Regency Prods., Inc. v. Nippon Herald Films, Inc., the Ninth Circuit affirmed a decision to vacate an arbitration award based on the undisclosed fact that the arbitrator was a senior executive of a film company that was in negotiations with an executive of one of the parties to co-produce a movie.  501 F.3d 1101, 1103 (9th Cir. 2007).  The arbitrator started his employment with Yari Film Group in mid-July 2004, during the pendency of the arbitration, and in late July 2004 it was reported that Yari Film Group was in negotiations to finance a film that would be produced by a production executive at New Regency, one of the parties to the arbitration.  Id. at 1107.  Rather than focusing on the finality

33

of the deal between Yari Film Group and New Regency, the court emphasized the fact that the <u>negotiations</u> occurred during the arbitration. <u>Id.</u> at 1110. Despite the lack of evidence that the arbitrator had actual knowledge of the negotiations, the court held that his failure to disclose demonstrated a "reasonable impression of partiality . . . sufficient to support vacatur." <u>Id.</u> at 1111. Recently, in <u>In re Sussex</u>, based in part on <u>New Regency's</u> holding, the Ninth Circuit stated that evident partiality could be demonstrated not only in cases where there was a "direct financial connection[] between a party and an arbitrator or its law firm" but also when there is a "<u>concrete possibility of such connections</u>." <u>In re Sussex</u>, 781 F.3d 1065, 1074 (9th Cir. 2015) (emphasis added) (citing <u>Schmitz</u>, 20 F.3d at 1044, 1049; <u>New Regency</u>, 501 F.3d at 1103), <u>cert. denied sub nom.</u> <u>Turnberry/MGM Grand Towers, LLC, v. Sussex</u>, 136 S. Ct. 156 (2015).

The facts in the instant case are analogous to <u>Valrose</u> and <u>New Regency</u>, and comport with the Ninth Circuit's explanation that a failure to disclose a "concrete possibility" of a connection between an arbitrator and a party or party law firm can result in a reasonable impression of partiality. <u>In re Sussex</u>, 781 F.3d at 1074. Although it appears that Cades did not begin to formally represent Yim during the arbitration, it

34

is clear that PSC, serving as Yim's agent, had discussions during the pendency of the proceedings related to Cades's potential representation of Yim.  Indeed, Cades completed a conflict check for Yim in June 2011 after Yim's appointment as arbitrator.  Cades actually received Yim's files prior to the issuance of the Partial Final Award, indicating that the attorney-client relationship was—at the least—close to being consummated.  Additionally, Yim still planned on being represented by Cades in February 2012, prior to the release of his Final Award.  In an email he sent to DPR the day prior to the first supplemental disclosure, Yim indicated that he would be billed directly by Cades for its work but would have minimal direct interaction with the firm.  Relatedly, per Yim's first supplemental disclosure, Yim anticipated "sign[ing] documents drafted by Cades" and receiving invoices directly from Cades for "compliance work done on his account."

In sum, the timing of the undisclosed relationship lends to our conclusion that the circuit court clearly erred in determining that Yim's failure to disclose did not result in evident partiality, because the communications between PSC—acting on Yim's behalf—and Cades occurred during the pendency of the arbitration, or otherwise stated, were not "distant in time, but rather ongoing during the arbitration."  New Regency, 501

35

F.3d at 1110. The operative facts demonstrate that—at the least—there was a concrete possibility that an attorney-client relationship would develop between the arbitrator and the law firm of party counsel.

We are further persuaded that the circuit court's conclusion regarding evident partiality was erroneous, given the substantive nature of the undisclosed relationship. In this respect, we also disagree with the ICA's conclusion that Yim's failure to disclose did not result in a reasonable impression of partiality based on the indirectness and insignificance of his relationship with Cades. The ICA noted that Yim did not plan on having direct interaction with Cades other than paying legal bills, and on this basis described the relationship as "arms-length." Madamba, SDO, 2014 WL 2180001, at *4 (internal quotation marks omitted). However, the fact that PSC would have acted as an intermediary between Yim and Cades is not determinative. Indeed, had Cades ultimately completed the work on Yim's retirement accounts, Cades would have been acting as Yim's personal attorney, resulting not only in a business and financial relationship, but also an attorney-client relationship, which carries with it heightened import.

Other courts have found a failure to disclose resulting in a reasonable impression of partiality based on more

distant relationships than the one at issue here. In New Regency, as discussed supra, the undisclosed relationship at issue was between a film company at which the arbitrator had been made a senior executive and an executive employed at New Regency. 501 F.3d at 1103. The arbitrator had no direct role in the negotiations between the two companies, and in fact, the record lacked evidence that the arbitrator was even aware of the potential relationship. Id. at 1107-08. Moreover, the New Regency executive who communicated with the arbitrator's film company did not appear to be "directly representing New Regency in the negotiations." Id. at 1110-11. Nonetheless, the court concluded the executive's ties to New Regency were of sufficient import to distinguish the relationship as more than attenuated. Id. The court's determination in this regard contributed to its holding that the district court properly vacated the arbitration award. Id.; see also Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 51 F.3d 157, 159 (8th Cir. 1995) (holding that the arbitrator's failure to disclose his company's business dealings with one of the parties required vacatur although the arbitrator was not "personally involved" in the relationship); Schmitz, 20 F.3d at 1044, 1049 (finding evident partiality where the arbitrator's law firm previously represented a parent company of one of the parties); Houston Vill. Builders, Inc. v. Falbaum,

105 S.W.3d 28, 34 (Tex. App. 2003) (stating that the arbitrator's "ongoing service as counsel" for a trade association of which parties were members "might create a reasonable impression of partiality toward" those parties).

Similarly, in Nordic, we cited favorably to a Texas Supreme Court case in which the court—adopting the reasonable impression of partiality standard—found evident partiality, based on an arbitrator's failure to disclose a more indirect relationship than the one at issue here. 136 Hawai'i at 48-49, 358 P.3d at 20-21. In the Texas case, each party to the arbitration at issue selected an arbitrator to serve as a party arbitrator, i.e., a non-neutral arbitrator. Burlington N. R.R. Co. v. TUCO Inc., 960 S.W.2d 629, 630 (Tex. 1997). The two party arbitrators then selected the third arbitrator, meant to "act as the only neutral decision maker." Id. It was later revealed that during the arbitration, the neutral arbitrator accepted "a substantial referral from the law firm of [one of the] non-neutral co-arbitrator[s]." Id. The arbitrator failed to disclose his acceptance of the work during the arbitration. Id. Despite arguments that the "relationship [was] too indirect because [the law firm at issue] was neither a party in the arbitration proceedings nor counsel for a party," the court determined "that a reasonable person could conclude that the

38

referral <u>might</u> affect [the neutral arbitrator's] impartiality" and accordingly, "trigger[ed] the duty to disclose." <u>Id</u>. at 638, 639. The court further noted, that although neither the non-neutral arbitrator nor the attorney who made the referral was aware of the other's relationship with the neutral arbitrator, "[a]n objective observer could still reasonably believe that a person in [the neutral arbitrator's] position, grateful for the referral, may have been inclined to favor [the law firm] as an entity," and accordingly, may have been partial toward the position of the co-arbitrator whose firm referred him. <u>Id.</u> at 637.

Here, in contrast to <u>Burlington</u>, the law firm with whom Yim had an undisclosed relationship—i.e., Cades—<u>was</u> representing a party to the arbitration and accordingly, functioned as an agent to one of the parties to the arbitration. <u>Cf</u>. <u>id.</u> at 640 (Enoch, J., dissenting) (noting that the non-neutral arbitrator "was chosen" by one of the parties but was "not their agent"). Further, the nature of the undisclosed relationship between Yim and Cades was more significant than the relationship between the arbitrator in <u>Burlington</u> and the law firm of his co-arbitrator. In <u>Burlington</u>, another attorney at the co-arbitrator's law firm had merely facilitated a meeting between the neutral arbitrator and the potential client. <u>Id.</u> at

39

631. Notably, although the referring attorney "attended the meeting and briefed the other participants" on certain issues regarding the litigation, "he had no authority to determine whether [the neutral arbitrator] should be hired." Id. Further, there was no indication in Burlington that the law firm would be involved in the litigation, beyond the initial referral. In contrast, in the instant case, Yim failed to disclose a relationship that could have resulted in the Romeros' counsel's law firm directly representing Yim in his personal capacity. As previously noted, this would include signing documents that Cades prepared and paying Cades directly for its work.

In sum, based on this record, we conclude that the circuit court clearly erred in its determination that Yim's failure to disclose did not result in evident partiality. We recognize that whether a failure to disclose creates a reasonable impression of partiality is a fact-driven question requiring a close analysis of the circumstances at issue. Here, the communications between PSC—acting as Yim's agent—and Cades were not distant in time, but instead were ongoing during the arbitration. In terms of substance, the anticipated relationship between Cades and Yim would have resulted in an attorney-client relationship with Cades representing Yim in his

personal capacity. Moreover, Yim's relationship with Cades was more than merely a prospective one, as Cades received the files related to Yim's retirement accounts during the pendency of the arbitration. It is also significant that Yim did not begin to disclose his relationship with Cades until after he issued the Partial Final Award.

Yim's failure to disclose his potential relationship with Cades prior to accepting appointment resulted in a violation of HRS § 658A-12(a) and his failure to disclose "facts . . . [he] learn[ed] after accepting appointment" resulted in a violation of HRS § 658A-12(b). If Yim had disclosed there was a fifty percent chance Cades would be retained to review his retirement accounts prior to the arbitration, it would have been reasonable for a litigant in Madamba's position to reject Yim as an arbitrator. See Kay, 119 Hawai'i at 230, 194 P.3d at 1192 ("It would have been perfectly reasonable and rational for a person in [the relevant party's] position to have rejected an arbitrator who had such connections—if disclosure had been made."); see also Schmitz, 20 F.3d at 1047 ("The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed."). Moreover, throughout the arbitration proceedings, while Cades and PSC continued to work towards finalizing the attorney-client relationship between

41

Cades and Yim, Yim did not make any related disclosures. Under these circumstances, we conclude that a reasonable impression of partiality was established.

### 2) A Finding of Evident Partiality Requires Vacatur

As explained supra, the undisclosed facts demonstrated a reasonable impression of partiality, and accordingly, resulted in a violation of the HUAA's disclosure requirements. Because Yim was a neutral arbitrator, evident partiality was established as a matter of law. See Nordic, 136 Hawaiʻi at 22, 358 P.3d at 50. Thus, the arbitration award must be vacated pursuant to HRS § 658A-23(a)(2)(A), which provides that the court "shall vacate an award made in the arbitration proceeding" upon a motion by a party to the proceeding if there was "[e]vident partiality by an arbitrator appointed as a neutral arbitrator[.]" (Emphasis added).

As noted supra, HRS § 658A-12(c) and (d) provide that if an arbitrator fails to disclose a fact required under subsections (a) or (b) of the statute, or if the arbitrator does disclose such a fact but continues to serve as arbitrator—following timely objection—the award "may" be vacated under HRS § 658A-23(a)(2). The function of the "may" language in the statutes is to provide reference to the different circumstances that require vacatur under HRS § 658A-23(a)(2), i.e., a neutral

42

arbitrator's evident partiality, and any arbitrator's corruption or misconduct. Supra note 14. For example, if a non-neutral arbitrator fails to make a disclosure required under HRS § 658A-12(a) or (b), although the award would not be vacated based on evident partiality—as evident partiality only applies to neutral arbitrators—it could be vacated based on the corruption and misconduct provisions in HRS § 658A-23(a)(2).[19]

In Nordic, because we remanded the case to the circuit court for an evidentiary hearing, we did not directly address the effect of a finding of evident partiality on a motion to vacate. However, we stated that the circuit court "has discretion under HRS § 658A-12(d) to decide whether or not to grant the motion to vacate." Nordic, 136 Hawai'i at 53, 358 P.3d at 25.[20] We now clarify that pursuant to the plain language of

---

[19] The HUAA is based on the Uniform Arbitration Act (UAA), drafted by the National Conference of Commissioners on Uniform Laws in 2000. The comment to section 12 of the UAA, which mirrors HRS § 658A-12 states as follows: "A party-appointed, non-neutral arbitrator's failure to disclose would be covered under the corruption and misconduct provisions of Section 23(a)(2) because in most cases it is presumed that a party arbitrator is intended to be partial to the side which appointed that person." Unif. Arbitration Act § 12 cmt. 4 (2000), available at http://www.uniformlaws.org/shared/docs/arbitration/arbitration_final_00.pdf. For a non-neutral arbitrator, the award would only be vacated if the arbitrator "fails to disclose information that amounts to 'corruption' or to 'misconduct prejudicing the rights of a party.'" Id. cmt. 5.

[20] In Nordic, we noted that the commentary to UAA section 12 provides that "[c]ourts also are given wider latitude in deciding whether to vacate an award under Section 12(c) and (d) that is permissive in nature (an award 'may' be vacated) rather than Section 23(a) which is mandatory (a court

(continued . . .)

43

HRS § 658A-23(a)(2), if a neutral arbitrator demonstrates evident partiality, the arbitration award shall be vacated.[21]

## B. Discovery Issues

Because we find that based on the record before us Yim's failure to disclose requires vacating the arbitration award, we need not address the circuit court's disposition of Madamba's request for additional discovery. However, we note that the ICA's determination that Madamba was not entitled to take Yim and DPR staff depositions based on DPR's claim of immunity was incorrect. See Madamba, SDO, 2014 WL 2180001, at *4. Pursuant to HRS § 658A-14(d)(2), an arbitrator or a representative of an arbitration organization is immune from

--------------------------------------------------

( . . . continued)

'shall' vacate an award)." 136 Hawai'i at 53, 358 P.3d at 25 (alteration in original) (footnote omitted) (quoting Unif. Arbitration Act § 12 cmt. 4). However, the comment also notes that "[c]hallenges based upon a lack of impartiality, including disclosed or undisclosed facts, interests, or relationships are subject to the developing case law under Section 23(a)(2)." Unif. Arbitration Act § 12 cmt. 4. Thus, the comment takes into account the fact that jurisdictions have developed different views regarding what constitutes evident partiality. As discussed supra, our standard for evident partiality based on a failure to disclose is equivalent to the standard laid out in HRS § 658A-12's disclosure provisions. Accordingly, in this context, once evident partiality is established, the arbitration award must be vacated.

[21] We note that in the instant case, there was no issue as to whether Madamba waived his right to challenge Yim's role as arbitrator. A party's right to challenge an arbitration award based on a failure to disclose and evident partiality may be waived under certain circumstances. See Nordic, 136 Hawai'i at 52-53, 358 P.3d at 24-25; Daiichi, 103 Hawai'i at 346-47, 82 P.3d at 432-33.

testifying unless the testimony is related "[t]o a hearing on a motion to vacate an award under section 658A-23(a)(1) or (2) if the movant establishes prima facie that a ground for vacating the award exits." Here, Madamba met its burden in establishing prima facie grounds to vacate the award, pursuant to the preceding discussion. Accordingly, Yim and DPR personnel were not immune from testifying.

### III. Conclusion

For the foregoing reasons, we vacate the ICA's June 20, 2014 judgments on appeal in CAAP-12-0000778 and CAAP-12-0000868[22] and vacate the circuit court's 1) August 27, 2012 Order Granting Respondents/Cross Petitioners' Application to Confirm Final Award of Arbitrator; 2) August 27, 2012 Order Denying Motion to Vacate Final Award of Arbitrator; 3) September 20, 2012 Judgment; 4) October 15, 2012 Order Granting Respondents/Cross-Petitioners' Motion for Attorneys' Fees and Costs; and 5) October 15, 2012 Judgment for Attorneys' Fees and Costs. We remand to the circuit court with instructions to

---

[22]     The ICA consolidated CAAP-12-0000868 with and under CAAP-12-0000778. See Madamba, SDO, 2014 WL 2180001, at *1, n.2. We consolidated SCWC-12-0000868 with and under SCWC-12-0000778 on September 29, 2014.

vacate the arbitration award and for further proceedings

consistent with this opinion.

Samuel P. King, Jr.        /s/ Mark E. Recktenwald
for petitioner

                            /s/ Paula A. Nakayama

Keith Y. Yamada and
Kirk M. Neste              /s/ Sabrina S. McKenna
for respondent

                            /s/ Richard W. Pollack



                            /s/ Michael D. Wilson